UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
UNITED STATES OF AMERICA,                          :        12-CR-430 (ARR)
                                                                     :
    -against-                                    :        NOT FOR PUBLICATION
                                                                     :
GREGORY JOHN SCHAFFER                               :        ORDER
*also known as* John Archambeault,                  :
                                                                     :
        Defendant.           :
                                                                     :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

      Defendant Gregory John Schaffer ("Schaffer") is charged with four counts under 18

U.S.C. § 2422 (part of the "Mann Act," 18 U.S.C. §§ 2421-2424) relating to his alleged

enticement of a minor to engage in illicit sexual activity. On March 14, 2014, Schaffer filed a

motion seeking the suppression of (1) pre-trial photo array identifications and (2) statements that

he made to agents interviewing him at his office during the execution of a search warrant. DE

#47. That same day, the government moved to admit at trial video evidence of Schaffer's prior

sexual assaults on two minors under Federal Rule of Evidence ("FRE") 413 and his possession

of child pornography under FRE 404(b). DE #46. On April 2, 2014, the court held a hearing

regarding the issues raised in Schaffer's suppression motion. The court now addresses both

motions together. For the reasons stated below, defendant's motion is denied, and the

government's motion is granted as to the video evidence of his prior sexual assaults on minors.

The court reserves decision until trial as to the admissibility of the child pornography.

# BACKGROUND

## I.  The Charges against Schaffer

Schaffer is charged in a four-count indictment with (1) coercion and enticement to travel in interstate or foreign commerce to engage in illegal sexual activity under 18 U.S.C. § 2422(a); (2) coercion and enticement of a minor to engage in illegal sexual activity under 18 U.S.C. § 2422(b); (3) attempted coercion and enticement to travel in interstate or foreign commerce to engage in illegal sexual activity under 18 U.S.C. § 2422(a); and (4) attempted coercion and enticement of a minor to engage in illegal sexual activity under 18 U.S.C. § 2422(b).  DE #5. The following allegations underlying the indictment are taken from the complaint.  DE #1.

According to the complaint, a 15-year-old girl ("Jane Doe") from Brooklyn, New York, notified law enforcement in March 2012 that she had been sexually assaulted by a 30 to 35-year-old man named "John."  Id. ¶ 3.  In late February or early March, Jane Doe had placed an advertisement on Craigslist indicating that she was a "Teen in need of a afterschool &amp; weekend job (NYC)."  Id. ¶ 4.a.  An individual using the name John Archambeault (subsequently identified as Schaffer) responded to the advertisement in an email stating that he was "looking for part time help in my store in Newport mall in jersey city."  Id. ¶ 4.b.  In subsequent emails, Jane Doe provided Schaffer with further information about herself, including that she was 15 years old, and they arranged to meet to discuss possible employment for Jane Doe.  Id. ¶ 4.c. Schaffer told Jane Doe that he owned several stores in the Newport Mall, including a Victoria's Secret store where he needed help.  Id.  He asked her about whether she would be coming to New Jersey alone and requested that she provide a photo for security purposes.  Id.

On or about March 17, 2012, Jane Doe traveled to Schaffer's office in Jersey City, New Jersey, accompanied by a male friend who was also a minor (the "Friend"). Id. ¶ 4.d. After they arrived, Schaffer took Jane Doe into a private office area and closed the door, while the Friend remained in the waiting area. Id. During the meeting, Schaffer told Jane Doe that she was probably going to work at the Victoria's Secret store, and he asked her whether she was sexually active or used drugs. Id. ¶ 4.e. He also gave her papers for her guardian, her great-grandmother, to sign. Id. That night, after Jane Doe informed Schaffer by email that her guardian had signed the paperwork, Schaffer asked Jane Doe to return the next day with the paperwork and told her to come alone because it might be her first day of work. Id. ¶ 4.f.

When Jane Doe returned to Schaffer's office on or about March 18, 2012, Schaffer had her sign a "confidentiality agreement" and an employment contract. Id. ¶ 4.g. After she signed the documents, Schaffer informed Jane Doe that she had agreed to have sex with him by signing the contract. Id. ¶ 4.h. Schaffer then asked Jane Doe to try on outfits, including a bathing suit, and took photos of her. Id. He told her that, if the job was important to her, she would try on the bathing suit. Id. At some point, Schaffer removed his own pants to reveal that he was wearing a men's Speedo bathing suit and told Jane Doe that he wanted to take photographs of them together. Id. Jane Doe told Schaffer that she did not feel comfortable. Id. He tried to place her hands on his genitals, and she asked if she could get out of the contract. Id. ¶ 4.i. Schaffer then asked her if she had a boyfriend and, when she told him that her boyfriend was 17 years old, threatened to "report" the boyfriend if she tried to get out of the contract. Id. He also threatened to sue her great-grandmother for breach of contract. Id. Schaffer then had sexual intercourse with Jane Doe on his desk and used a condom from his desk drawer. Id. ¶ 4.j. Jane Doe tried to reach for her phone several times, but Schaffer blocked her hand. Id. Afterwards, Schaffer told

Jane Doe that he would remove the sex part of the contract.  Id. ¶ 4.l.  He shredded the contract

that she had signed and gave her a new one, but he told her it would be a breach of her

confidentiality agreement if she told anyone what happened between them.  Id.

While Jane Doe was in Schaffer's office, there was a black camera on a tripod in the

office.  Id. ¶ 4.n.  The black camera was in the room while she changed into the bathing suit, and

then Schaffer replaced it with a red camera once she was wearing the bathing suit.  Id.

## II.    The Photo Array

At the hearing on April 2, 2014, Detective Rose Muckenthaler of the New York City

Police Department ("NYPD") testified about her role in conducting the photo arrays in which

Jane Doe and her Friend identified Schaffer.  After Jane Doe reported what had happened with

"John Archambeault" to authorities, Detective Muckenthaler spoke with Jane Doe approximately

twice and took notes of the physical description of "John Archambeault" described by Jane Doe.

Tr. of April 2, 2014 Hearing ("Tr.") 70.  The notes include the description "light skin, white,"

"thin hair," what appears to be "Blackish/grey," "glasses," "brown" (possibly referring to eye

color), "teeth crooked/teeth rotten," and "skinny, beer belly."  DE #55, Ex. 1.

Detective Muckenthaler used the email address from which "John Archambault"

communicated with Jane Doe and traced the account to Schaffer's name and address in New

Jersey.  Tr. 70-71.  Once she had identified him, Detective Muckenthaler unsuccessfully

attempted to find a photograph of Schaffer using an NYPD database.  Id. at 71.  Her partner,

Detective Walter Hawkins, ran a search and obtained a photograph of Schaffer from the New

York/New Jersey High Intensity Drug Trafficking Area ("HIDTA") database.[1]  Id.  At Detective

---

[1] At the hearing, Detective Muckenthaler mistakenly referred in testimony to the "HIDEA" database.

Muckenthaler's request, Detective Hawkins then retrieved five additional photos from the HIDTA database and prepared a photo array of the six photos, including the photo of Schaffer. Id. at 70-71.

On the evening of March 22, 2012, Detective Muckenthaler and another NYPD detective met with Jane Doe outside of Jane Doe's great-grandmother's house in Brooklyn. Id. at 72-73. Jane Doe sat in the back seat of the detectives' vehicle while Detective Muckenthaler at first made small talk with her, and then Detective Muckenthaler showed her the photo array that included Schaffer's photo. Id. at 73. Although Detective Muckenthaler did not think that Jane Doe took time to read the admonition at the bottom of the photo array, she instructed Jane Doe that "the person may or may not be in the photo array" and that she should take her time. Id. at 73-75, 91. After approximately one minute, Jane Doe identified photograph Number 2, which was the photo of Schaffer. Id. at 75. Jane Doe circled photograph Number 2 and signed and dated the array. Id. at 76.

Immediately after showing Jane Doe the photo array, Detective Muckenthaler met with the Friend in a park in Brooklyn. Id. at 77. Prior to Muckenthaler's going to the park to meet the Friend, Jane Doe called the Friend to let him know that NYPD officers were on their way to meet him. Id. at 94. Detective Muckenthaler showed the Friend the photo array and instructed him that "the person may not or may be in this photo." Id. at 79. The Friend picked out photo Number 2, which was the photo of Schaffer, in less than one minute. Id. He also marked the photo and signed and dated the array. Id.

Schaffer has moved to suppress the photo identification as unduly suggestive. Neither Schaffer nor his counsel was present during the presentation of the photo arrays. The

government has provided the photo arrays to Schaffer and the court. The government indicates that it does not intend to introduce the pre-trial identifications at trial but rather that it will rely solely on in-court identifications.

**III.    Execution of the Search Warrant**

On March 19, Schaffer again contacted Jane Doe about possible employment, and law enforcement personnel, consensually impersonating Jane Doe, responded from her email account and arranged a meeting at Schaffer's office in New Jersey. Special agents with the Department of Homeland Security, Homeland Security Investigations ("HSI") obtained a search warrant for the defendant's office, which they executed on June 3, 2012, around 3:30 p.m. at the time at which Schaffer and agents impersonating Jane Doe had agreed to meet. Tr. at 14-15.

At the hearing on April 2, 2014, HSI Special Agent Robert Mancene, who took part in the execution of the search warrant, testified as to the search of Schaffer's office and the agents' interview of Schaffer on June 3, 2012. The court finds Agent Mancene's testimony credible, particularly in light of the fact that it is controverted only by Schaffer's own self-serving declaration. See United States v. Parra, 302 F. Supp. 2d 226, 234 (S.D.N.Y. 2004) (crediting another witness's in-court testimony that was "uncontroverted but for defendant's conclusory, un-cross-examined declaration").

According to Agent Mancene, nine agents conducted the search of Schaffer's office at 559 Newark Avenue in Jersey City, New Jersey. Tr. 15. When they arrived, Special Agent Megan Buckley knocked on the door, but no one answered. Id. The agents waited and then entered, at which point they found Schaffer just inside the doorway, which led to a narrow hallway inside the building. Id. at 15, 17. The door to Schaffer's office was off the hallway just

to the left of the entry to the premises.  Id. at 17.  The agents escorted Schaffer to the side of the hallway inside the door while they did a one or two-minute security sweep of the premises.  Id. at 16.  The agents did not have their weapons out, and Schaffer was not handcuffed at this point. Id. at 16, 28.  The agents identified themselves to Schaffer and informed him that they were there to carry out a search warrant.  Id. at 16.

After the security sweep, the agents asked Schaffer if he would be willing to speak with them, and he agreed.  Id. at 17.  Agent Mancene and Agent Buckley sat down with Schaffer to interview him.  Id.  The two of them spoke with Schaffer while the other agents executed the search warrant for his office.  Id. at 19.  They informed him before and during the interview that he was not under arrest.  Id. at 19, 34.  The interview lasted for approximately one hour.  Id. at 20.  At the start of the interview, Detective Mancene covered the security camera in the area with his jacket.  Id.  According to him, it was for security purposes and to "protect the integrity of the investigation" because he did not know who might be able to view the footage from the camera. Id.  Agent Buckley took handwritten notes, and Agent Mancene later created a typewritten report.  Id. at 37.  During the interview, Schaffer drank coffee, which he had provided for himself, and smoked cigarettes.  Id. at 19, 50.  According to Detective Mancene, at no point did Schaffer ask for medication.  Id.  at 21.

At some point, Schaffer asked if he should have an attorney present.  Id. at 20.  Detective Mancene responded that it was within Schaffer's rights to have an attorney present but that he (Mancene) was "not there to counsel him on whether he should have an attorney or not."  Id. After that, Schaffer continued to speak with the agents.  Id. at 20-21.  At no point during the interview did Schaffer actually ask for a lawyer, and Agent Mancene testified that, had Schaffer asked for one, the agents would have immediately stopped the interview.  Id. at 59-60.

On two occasions during the interview, Schaffer asked if he could leave. Id. at 21. He said that he needed to go up the street to collect money from an attorney named "Jimmy Lisa" for whom he had done computer work and that he needed the money to purchase medicine. Id. at 21, 45-46, 59. Schaffer did not indicate that Jimmy Lisa was his attorney. Id. at 59. Detective Mancene told Schaffer that he could not leave at that time because it would be a "security issue." Id. at 21. At that point in time, the agents executing the warrant had set up "the boxes and the chains of custody, and they were all over the floor by the threshold of the doorway, so they would be difficult to get through that and it would be somewhat of a security issue." Id. The agents conducting the search were in "compromised positions" and had placed boxes of evidence in the narrow hallway where the evidence was unsecured. Id. at 35-36. Agent Mancene did not recall whether Schaffer ever asked whether there was another door that he could go out. Id. at 48. However, Agent Mancene testified that he would not have permitted Schaffer to go out the other door to the outside because it would require going through the office of another private business that was not covered by the search warrant and that using that door would cause the alarm to go off.[2] Id. at 48-49.

After the interview concluded, Detective Mancene reviewed the evidence collected from Schaffer's office and called an Assistant United States Attorney for the Eastern District of New York. Id. at 21. At that time, the decision was made to place Schaffer under arrest. Id. at 22. He was read his Miranda rights and handcuffed. Id. He later signed a waiver of his Miranda rights at the HSI offices. Id. at 22, 38.

---

[2] According to Mancene, other agents appear to have set off the other business's alarm at some point during their security sweep of the premises. Tr. 47. However, he does not believe that agents actually entered the office. Id. at 49-50.

Schaffer seeks to suppress all statements made to the detectives during the interview at his office on the grounds that they were obtained in violation of his Fifth Amendment rights.

## IV.    The Videos and Pornography Recovered from Schaffer's Office

During the search of Schaffer's office on June 3, 2012, the items recovered by the agents included a computer, a camcorder, and a number of electronic storage devices. Agents subsequently obtained a search warrant for those devices. They discovered approximately 85 images of child pornography (comprised mainly of video and some still images) and four videos depicting Schaffer with two different minor girls.

In the first video involving Schaffer and a minor, Schaffer directs a young girl ("Jane Doe #2") to try on three different bathing suits. Jane Doe #2 tries on the dresses in Schaffer's presence, and he adjusts them on her body, while touching her in the process. At one point, Jane Doe #2 sits in Schaffer's lap with his arm around her, and then she eventually performs oral sex on Schaffer. The second video is a continuation of the first video and depicts Schaffer fondling Jane Doe #2 before appearing to either have sexual intercourse with her or masturbate on top of her. During portions of the video, Schaffer wears a speedo bathing suit. At the end of the video, Jane Doe #2 dresses, and several other persons walk into the room. The first and second videos are each approximately six minutes in length. Jane Doe #2 was located by law enforcement and indicated that she was less than 16 years old when the videos were made. She believes that she was 8 or 9 years old at the time that Schaffer recorded the videos.

The third and fourth videos of Schaffer, which are together approximately 87 minutes in length, depict another young girl ("Jane Doe #3") in a hotel room with Schaffer. Jane Doe #3 tries on bathing suits and sits on the bed with Schaffer. At various points, Schaffer tells Jane

Doe #3 that he is an FBI agent, that he will buy basketball season tickets for her, and that he is giving her a laptop. In the fourth video, Jane Doe #3 appears naked on the bed with a shirtless Schaffer next to her. At several points, Schaffer goes into the bathroom with Jane Doe #3 and closes the door while the videotape continues to run. The government indicates that Jane Doe #3 has stated that Schaffer sexually assaulted her while away from the camera in the bathroom. Later in the video, Jane Doe #3 is once again wearing a bathing suit when Schaffer pulls her into his lap on the bed and forces her arm around him. At another point, Schaffer asks Jane Doe #3 a number of questions related to her knowledge of sex and her sexual experiences. Eventually, shortly before Jane Doe #3 leaves the room, Schaffer tells her that nobody else ever finds out about the things that they talk about together. Law enforcement located Jane Doe #3, and she also indicated that she was less than 16 years of age at the time of the videos. She cannot recall her exact age but believes that she was in the seventh grade and was approximately 12 or 13 years old in the videos.

The government seeks to admit as evidence at trial select portions of the four videos pursuant to FRE 413, and the court has reviewed those excerpts of the videos in camera. The government also seeks to admit clips from ten videos and three still images of child pornography recovered from Schaffer's computer under FRE 404(b). The court has also reviewed those materials, which depict explicit sexual contact involving girls who appear to be as young as 5 years old. While several of the videos involve girls who appear to be pre-teens or teenagers closer to age 15, a number of the videos involve girls who appear prepubescent and much younger than 15.

**DISCUSSION**

I.    <u>**The photo array was not unduly suggestive.**</u>

A showing of a "very substantial likelihood of irreparable misidentification" is required to challenge the admissibility at trial of identification testimony on due process grounds. <u>Manson v. Brathwaite</u>, 432 U.S. 98, 116 (1977) (quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)).  Using a two-step analysis, a "court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." <u>Raheem v. Kelly</u>, 257 F.3d 122, 133 (2d Cir. 2001).  "The suggestiveness of an out-of-court identification based on photos depends upon factors such as the number of photos presented to the identifying witness, the manner of presentation by the officers present, and the contents of the photos." <u>United States v. Salomon-Mendez</u>, No. 12 Cr. 269(JGK), ---F. Supp. 2d---, 2014 WL 201524, at *1 (S.D.N.Y. Jan. 20, 2014).  If the court finds that the pre-trial identification procedures were unduly suggestive, then it must ask "whether an in-court identification will be the product of the suggestive procedures or whether instead it is independently reliable." <u>United States v. Concepcion</u>, 983 F.2d 369, 377 (2d Cir. 1992).  If, on the other hand, the court finds that the procedures were not suggestive, then no further inquiry is required.  <u>Salomon-Mendez</u>, 2014 WL 201524, at *1 (citing <u>Raheem</u>, 257 F.3d at 133).

Here, Schaffer argues that the photo array itself was unduly suggestive because his photo was substantially brighter than the other five photos, and thus stood out conspicuously from the other photos.  He argues that this was particularly suggestive because it made his skin appear

lighter in the photo, which made his appearance paler than those of the other five individuals and closer to Jane Doe's description of the perpetrator as having "light skin."[3]

Having reviewed the photographs in the original array, the court finds no indication of suggestiveness. Contrary to Schaffer's assertions, he is not the only one in the photos with "light skin." Each photo is a frontal depiction of a male against a greyish or greenish background, and all individuals pictured are of approximately similar age, skin color, and appearance. They have roughly similar hair and facial hair with slight variations in color and style. Although Schaffer's photo appears somewhat brighter, causing him to appear slightly paler than the other individuals, all of the individuals are white and have light skin.[4] None of the differences in the photo would suggest to a witness that Schaffer was "more likely to be the culprit." Salomon-Mendez, 2014 WL 201524, at *2 (quoting United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994)). Based on the court's examination of the photos, the fact that Schaffer's photo is somewhat brighter does not render the array suggestive. See Bautista, 23 F.3d at 731 (finding that array was not suggestive where defendant's photo was "slightly brighter and slightly more close-up than the others" but the photos were otherwise similar in appearance); United States v. Zadiriyev, No. 08 CR 1327(HB), 2009 WL 1787922, at *2-*3 (S.D.N.Y. June 23, 2009).

Schaffer also argues that the procedures used to conduct the pre-trial identifications were unduly suggestive. First, he argues that there was somehow a taint of suggestiveness because, according to Detective Muckenthaler's testimony, Jane Doe and the Friend did not appear to read

---

[3] Schaffer accuses the investigating agents of having purposely brightened his photograph in order to draw attention to it. This is mere speculation without any basis. In fact, Detective Muckenthaler testified that, although she was not certain, she did not believe that there were any features of the HIDTA program that would allow a detective to change the brightness of the picture and that she knew that there was not such a feature on the NYPD program. Tr. 85.

[4] Schaffer relies heavily on Jane Doe's description of the culprit as having "light skin." The court notes that having "light skin" does not necessarily equate to being especially pale, as Schaffer would have it.

the admonition at the bottom of the array prior to making their identifications. However, Detective Muckenthaler testified that she told them that the suspect "may or may not be in the photo." Tr. 74, 91. She told Jane Doe to take her time in making an identification, id. at 75, and she did not tell either witness whether the person they had identified was in fact the suspect, id. at 92. Schaffer also argues that Detective Muckenthaler did not instruct Jane Doe not to tell her Friend about the photo array, but he points to nothing in the record that would in any way suggest that Jane Doe provided the Friend with any information about the photo array before the Friend made his own identification. There is simply nothing about these instructions or the circumstances surrounding the pre-trial identifications indicating that even an element of suggestiveness was involved in the conduct of the photo arrays. These procedures were not improperly suggestive.

Schaffer also submits that the manner of the photo arrays was suggestive because the photos were shown simultaneously rather than sequentially and because they were not double-blind (i.e., Detective Muckenthaler knew the identity of the suspect at the time she conducted the array). Defendant relies entirely on social science research and does not cite a single case from this circuit in support of his contentions that such procedures are unduly suggestive. The court notes that the Seventh Circuit has stated that a sequential array may be less suggestive than a simultaneous one. See United States v. Ford, 683 F.3d 761, 765 (7th Cir. 2012). By contrast, the Third Circuit has rejected the argument that a simultaneous array of six photographs on a single sheet is more suggestive than a sequential array. See United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003). Given that courts in this circuit have repeatedly found photo arrays involving more than one photograph simultaneously displayed on a single page not to be unduly suggestive, the court finds that the simultaneous presentation of a photo array is not considered

inherently suggestive under the law applicable in this circuit. See, e.g., United States v. Thai, 29 F.3d 785, 807-10 (2d Cir. 1994); United States v. Leonardi, 623 F.2d 746, 755 (2d Cir. 1980) (five-photo spread not unduly suggestive); Zadiriyev, 2009 WL 1787922, at *1-*3; United States v. Hamideh, No. 00 CR. 950 NRB, 2001 WL 11071, at *1 (S.D.N.Y. Jan. 3, 2001).

In light of the "totality of the circumstances," the court finds that the pre-trial photo array identifications were not improperly suggestive, Thai, 29 F.3d at 808, and no further hearing on this issue is merited. The defendant's motion to suppress the pre-trial identifications is denied.

## II.    Schaffer was not in custody for Fifth Amendment purposes when he was interviewed during the execution of the search warrant at his office.

Under the Fifth Amendment, statements made by an individual while in custody must be suppressed if made in the absence of Miranda warnings. Miranda v. Arizona, 384 U.S. 436 (1966). To determine whether an individual is in custody for Miranda purposes, the first step is to examine whether, in light of the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)) (alteration in original). Factors relevant to this inquiry include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the interview, and the release of the interviewee at the end of the questioning. Id.

However, the curtailment of an individual's freedom of movement is "simply the first step in the analysis." Id. "Not all restraints on freedom of movement amount to custody for purposes of Miranda." Id. A court must also ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in

<u>Miranda</u>." <u>Id.</u> at 1190. The "ultimate inquiry" is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>United States v. Newton</u>, 369 F.3d 659, 670 (2d Cir. 2004) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). Schaffer argues that he was in custody when he was interviewed during the search of his office and that, accordingly, his statements to the interviewing agents should be suppressed because he was not provided with <u>Miranda</u> warnings.

On the one hand, Schaffer was informed that he was not under arrest and he voluntarily agreed to speak with Agent Mancene and Agent Buckley. He was not handcuffed or otherwise physically restrained during the interview, which lasted "about an hour," Tr. 20, and the two agents interviewing him did not have their weapons out. The interview took place in the familiar setting of his own office premises, and Schaffer drank coffee and smoked cigarettes. These are factors that would typically weigh against the conclusion that a defendant was in custody. <u>See, e.g.,</u> <u>United States v. FNU LNU</u>, 653 F.3d 144, 155 (2d Cir. 2011) (fact that weapons were not drawn and no restraints were used relevant to finding that defendant's interrogation was not custodial); <u>Newton</u>, 369 F.3d at 676 (fact that defendant was told he was not under arrest is important factor in evaluating whether defendant was in custody); <u>United States v. Badmus</u>, 325 F.3d 133, 139 (2d Cir. 2003) (agents told defendant and his wife that they were not under arrest and conducted interview in familiar setting of defendant's home); <u>United States v. Mitchell</u>, 966 F.2d 92, 99 (2d Cir. 1992) (interrogation in familiar surroundings of one's home generally not custodial); <u>United State v. Abbas</u>, 418 F. Supp. 2d 280, 286 (W.D.N.Y. 2006) (considering it relevant that interview took place at defendant's workplace rather than at police station); <u>United States v. James</u>, 113 F.3d 721, 727 (7th Cir. 1997) (no custodial interrogation where questioning took place at defendant's workplace); <u>United States v. Martindale</u> 790 F.2d 1129, 1133 (4th Cir.

1986) (interrogation in defendant's own office not custodial); <u>United States v. Rorex</u>, 737 F.2d 753, 756-57 (8th Cir. 1984) (same).

Furthermore, there is no credible evidence that Schaffer ever asked to have an attorney present. Agent Mancene testified that Schaffer said he needed to get some money from Jimmy Lisa, a lawyer for whom he had performed some computer work, but that Schaffer never indicated that Lisa was his lawyer or that he wanted to speak with him regarding the interview. Although Agent Mancene testified that Schaffer asked whether he should speak to an attorney, he at no point actually asked to speak with one.

On the other hand, there are circumstances present which suggest that Schaffer's freedom of movement may have been curtailed during the interview. <u>See</u> <u>Abbas</u>, 418 F. Supp. 2d at 286 (agent's blocking of door to the outside while defendant went to wash his hands indicative of custody). When Schaffer asked if he could leave, Agent Mancene told him that he could not leave at that point because there were boxes stacked near the doorway and Schaffer's leaving through the hallway could potentially compromise the security of the investigation. While this indicates that Schaffer's freedom to leave was curtailed in some degree, courts in this circuit have previously found that a defendant was not in custody under similar circumstances where the freedom of movement was limited in some degree. For example, in <u>Badmus</u>, the Second Circuit upheld a district court's finding that a defendant was not in custody where he was told that he was not under arrest, despite the fact that, after consenting to a search of their apartment, defendant and his wife were asked to stay seated in their living room and not permitted to move freely about their apartment while approximately six agents conducted a search there. 325 F.3d at 139; <u>see also</u> <u>United States v. Stone</u>, No. 1:12-cr-133-jgm-5, 2013 WL 5274850, at *4 (D. Vt. Sept. 18, 2013) (interrogation not custodial even where defendant's freedom of movement

somewhat restrained when investigator blocked his only exit from an elevated porch); United States v. Ramos, No. 1:11-cr-111-jgm-1, 2012 WL 6708191, at *12 (D. Vt. Dec. 26, 2012) (interrogation not custodial even where agents outnumbered the defendant four-to-one, sat in close proximity to her, and blocked the front door); United States v. Lifshitz, No. 03 CR. 572(LAP), 2004 WL 2072468, at *6-*9 (S.D.N.Y. Sept. 15, 2004) (interrogation not custodial where defendant was told he was not under arrest, he agreed to answer questions, and questioning took place in his home despite the fact that agents asked him for safety reasons not to move around the house but to wait until the conclusion of the interview to leave to get dressed and to smoke a cigarette); cf. United States v. Kirsh, 54 F.3d 1062, 1067-68 (2d Cir. 1995) (defendant not in custody when taken into hall and told that she could stay or leave but could not enter her apartment during execution of a search warrant).

Most similar to the case at hand, in United States v. Groezinger, 625 F. Supp. 2d 145 (S.D.N.Y. 2009), law enforcement agents executed a search warrant of a defendant's home while agents remained with him in the kitchen, questioned him, and limited his freedom to move about his home for approximately an hour and a half. While Groezinger was questioned by two agents at his kitchen table, agents stood so as to block his exit from the kitchen, and he was twice told to sit down when he tried to get up from the kitchen table where he was being questioned by two agents. Id. at 158. When Groezinger told the agents that he needed to leave to catch his train to work, the agents informed him that he was going to be late. Id. Groezinger was, however, explicitly told that he was not under arrest and was permitted to make coffee for himself while detained in the kitchen. Id. The court in that case found that, although Groezinger's freedom of movement had been limited in some degree, a reasonable person would not have "understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. (quoting

<u>Newton</u>, 369 F.3d at 672). The court agrees and reaches the same conclusion under the highly analogous circumstances of Schaffer's case.

Based on the totality of the circumstances, the court finds that a reasonable person in Schaffer's circumstances would not "have understood that his interrogation was being conducted pursuant to arrest-like restraints." <u>Newton</u>, 369 F.3d at 677. Schaffer was not in custody for <u>Miranda</u> purposes, and accordingly his motion to suppress his statements made to agents during the interview is denied.

## III. <u>The video evidence of Schaffer's prior sexual assaults on minors is admissible under FRE 413.</u>

The government seeks to introduce portions of the four videos recovered from Schaffer's electronic devices as evidence of his prior sexual assaults on two other minor girls. Although propensity evidence is not generally allowed under FRE 404, it may be allowed in a sexual offense case under FRE 413. FRE 413 states:

> In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant.

Fed. R. Evid. 413(a). This rule "renders evidence of prior sexual assaults presumptively admissible in a federal prosecution for sexual assault." <u>Morris v. New York</u>, No. 07-CV-3418 (JG), 2008 WL 850679, at *6 (E.D.N.Y. Mar. 29, 2008) (citing <u>United States v. Enjady</u>, 134 F.3d 1427, 1433 (10th Cir. 1998), which held FRE 413 constitutional). Under FRE 413, "sexual assault" means, <u>inter alia</u>, "a crime under federal law or under state law involving" (1) "contact, without consent, between any part of the defendant's body---or an object---and another person's genitals or anus;" (2) "contact, without consent, between the defendant's genitals or anus and any

part of another person's body;" or (3) an attempt or conspiracy to engage in the conduct described in (1) or (2). Fed. R. Evid. 413(d).

First, Schaffer does not appear to contest the government's characterization of the charges against him in this case as well as the prior acts evidenced by the videos as involving "sexual assault" within the meaning of FRE 413. This court agrees with the government that offenses under 18 U.S.C. § 2422 involving the enticement of a minor to engage in illegal sexual activity, as charged in this case, fall within the realm of crimes involving nonconsensual sexual contact defined as "sexual assault" under the rule.[5] This conclusion is consistent with that reached by courts in other circuits. E.g., United States v. Hitt, 473 F.3d 146, 159 (5th Cir. 2006) (involving charges under 18 U.S.C. §§ 2422 and 2423); United States v. Blazek, 431 F.3d 1104, 1108-09 (8th Cir. 2005) (same); cf. United States v. Batton, 602 F.3d 1191, 1197 (10th Cir. 2010) (involving charges under 18 U.S.C. § 2423 only).

Second, the video evidence is highly relevant to the charges against Schaffer. As part of its case, the government must prove that, when Schaffer enticed Jane Doe to travel across state lines, he had the intent to engage in sexual conduct with her. Schaffer's prior acts demonstrating his sexual interest in minor females are extremely relevant to the question of his intent here. This is particularly so because of the similarities between the conduct shown on the videos and Schaffer's alleged conduct with Jane Doe. The videos show a pattern of Schaffer's enticing girls into situations in which they are alone with him and making them try on swimsuits before forcing them to engage in sexual conduct. This pattern is highly probative of the question of his

---

[5] All of the minors involved in this case were legally incapable of consent under federal law at the time of the relevant conduct. See 18 U.S.C. § 2243(a) (setting the age of consent at 16); United States v. Rogers, 587 F.3d 816, 820 (7th Cir. 2009).

intent here.[6]  See Batton, 602 F.3d at 1198 (finding evidence relevant where "[d]espite the

passage of time, the similarities between the victims and the conduct in each of the cases is

striking---they fully support a pattern of grooming and assaulting young male victims");  Hitt,

473 F.3d at 159 ("This modus operandi evidence is relevant to whether sexual activity occurred

between the defendants and [the victim], which is relevant to whether the defendants had the

requisite intent to engage in illicit sexual activities across state lines.");  United States v.

Donaldson, No. 09-CR-321, 2012 WL 2317343, at *5 (W.D.N.Y. June 18, 2012) (finding

evidence of prior sexual assaults that "depict a pattern of similar conduct" by defendant highly

probative).

Third, applying the FRE 403 balancing test after having reviewed the videos in camera,

the court finds that the probative value of the portions of the videos that the government seeks to

introduce are not substantially outweighed by the danger of unfair prejudice to Schaffer.  As

discussed above, the video evidence showing conduct with minors that occurred close in time

and that is highly similar in pattern is extremely probative of Schaffer's intent in this case.

Schaffer argues, however, that the probative value of the videos is outweighed by their potential

prejudicial effect because they involve minors who are younger than Jane Doe (and therefore

those prior acts are more serious or inflammatory).  The Second Circuit has stated that prior acts

_____

[6] Schaffer appears to argue that the videotapes are not relevant under FRE 413 because FRE 414 properly covers evidence of similar crimes in child molestation cases.  FRE 414 is similar to FRE 413 but covers only those cases involving "child molestation," where "child" means a person under the age of 14.  Schaffer appears to argue that, because Jane Doe #2 and Jane Doe #3 were children within the meaning of FRE 414 at the time the tapes were made but Jane Doe was not, the videotape evidence is somehow not admissible under FRE 413.  FRE 414 explicitly states that it "does not limit the admission or consideration of evidence under any other rule." Fed. R. Evid. 414(c). Schaffer's attempt to distinguish Jane Doe as "an admitted sexually active adolescent" is a red herring.  DE #51, at 2.  At the time of the alleged conduct, Jane Doe was a 15-year-old minor who was legally incapable of consent, and the court has concluded that the charged crime against her qualifies as a "sexual assault" within the meaning of FRE 413.  Nothing about the fact that the videos involving Jane Doe #2 and Jane Doe #3 could also be admitted in a different case under FRE 414 prevents them from being admitted here under FRE 413 where they are evidence of a highly relevant propensity and pattern of conduct.  See United States v. Seymour, 468 F.3d 378, 385 (6th Cir. 2006) (finding "no incompatibility" between FRE 413 and FRE 414).

of child molestation "may be highly prejudicial but not necessarily <u>unfairly prejudicial</u>."  <u>United</u>

<u>States v. Davis</u>, 624 F.3d 508, 512 (2d Cir. 2010) (internal quotation marks omitted).  Here,

having reviewed the videos, the court cannot conclude that the videos are more serious or

inflammatory than the allegations that the defendant engaged in nonconsensual sexual

intercourse with a 15-year-old girl.  Although there is a slight age difference between Jane Doe

and the other two girls, it is not great, particularly in the case of Jane Doe #3 who believes that

she was 12 or 13 years old in the video.  While the age of Jane Doe #2 (she believes 8 or 9 in the

video) gives cause for more concern, the court is satisfied from its review of the videos that

neither Jane Doe #2 nor Jane Doe #3 appears identifiably younger than 15.  They appear to be

pre-teen or teenage, pubescent girls who could be attributed with an age range somewhere

between 12 and 16.  Even were slight differences in age discernible, the differences are not so

inflammatory as to be unfairly prejudicial.  <u>See</u> <u>United States v. Reynolds</u>, 720 F.3d 665, 670-71

(8th Cir. 2013) (upholding admission of evidence involving 11-year-old in case involving 13-

year-old); <u>Blazek</u>, 431 F.3d at 1108-09 (upholding admission of prior acts with 11-year-old in

case involving 15-year-old); <u>United States v. Breitweiser</u>, 357 F.3d 1249, 1254 (11th Cir. 2004)

(upholding admission of evidence involving sexual contact with 13-year-olds in case involving

14-year-old); <u>United States v. Walker</u>, 261 F. Supp. 2d 1154, 1157 (D.N.D. 2003) (admitting

evidence involving 4-year-old in case involving 8-year-old).  Moreover, the government has

limited the potential for prejudice by limiting the portions of the video it seeks to introduce to

clips involving only a minor amount of explicit content.

Accordingly, the selected portions of the four videos are admissible.  In order to mitigate

the potential for prejudice, the court will provide limiting instructions to the jury members

regarding the purposes for which they may consider the video clips.

**IV.** **The court reserves decision on the admissibility of the child pornography found in defendant's possession.**

The government also seeks to introduce some of the child pornography recovered from Schaffer's devices as evidence of his intent pursuant to FRE 404(b). Although evidence of a defendant's prior crimes, wrongs or other acts are not admissible to prove a person's character, they made be admissible for purposes of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). In evaluating whether evidence may properly be admitted under FRE 404(b), a court must: (1) determine whether the evidence is being admitted for a proper purpose (and not to prove the defendant's criminal propensity); (2) determine whether it is relevant to an issue in the case; (3) evaluate whether its probative value is substantially outweighed by the danger of unfair prejudice; and (4) provide an appropriate limiting instruction to the jury. United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); see also United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002). The government argues that the evidence of Schaffer's possession of child pornography is probative of his intent to violate 18 U.S.C. § 2422. Specifically, it argues that Schaffer's possession of child pornography is relevant to a jury's evaluation of Schaffer's intent to engage in sexual activity with Jane Doe when he communicated with her and enticed her to travel across state lines.

For support, the government relies on United States v. Brand, 467 F.3d 179 (2d Cir. 2006). In that case, Brand was charged with virtually identical offenses related to traveling between states for the purpose engaging in illicit sexual conduct with another person in violation of 18 U.S.C. § 2423(b) and using a means of interstate commerce to entice a minor to engage in sexual activity for which any person can be charged with a criminal offense in violation of 18

U.S.C. § 2422(b).  Id. at 182.  The Second Circuit concluded that "[t]he images Brand possessed

on his computer were relevant to determining whether, in traveling across state lines to meet [a

13-year-old girl] and in attempting to entice [the minor female], Brand intended to engage in

illicit sexual activity or, alternatively, some more innocuous act."  Id. at 197.  The Second Circuit

found that Brand's possession of child pornography made it "more probable" that his intent was

to engage in illicit sexual activity with the minor girl and that there was a sufficient similarity or

connection between child pornography and pedophilia as to make the pictures relevant evidence.

Id. at 197-99.  This court can find no material distinctions between the relevance of the evidence

admitted in Brand and the relevance of the evidence that the government seeks to admit here.

Nonetheless, although the Second Circuit has upheld the admission of this type of

evidence in a similar case, this court must conduct a balancing test under FRE 403 that takes

account of the particular circumstances in the case at hand.  Having reviewed the child

pornography that the government seeks to introduce, the court harbors serious concerns about the

potential for unfair prejudice that could result from the introduction of the still images and video

clips.  These pornographic materials, while probative of Schaffer's intent, are of lesser probative

value than the four videos discussed above because, unlike those videos, they do not demonstrate

Schaffer's own actions and pattern of conduct with minor females.  At the same time, the

pornographic materials pose a greater risk of prejudice because they are extremely explicit and,

in most cases, involve young girls who are visibly pre-pubescent.  To the extent that several of

these materials appear to show teenage girls of roughly the same age as Jane Doe (for example,

government labeled Videos 6 and 8 and Image 1), there is a lesser risk of prejudice than with the

others, but the probative value is still significantly less than that of the videos involving Schaffer

himself.  The probative value of these materials also appears to be minimized by the fact that the

government may introduce the other four videos of Schaffer at trial.  Because of the difficulty of fully assessing the probative value of the additional pornographic materials outside the context of trial, the court declines to rule on their admissibility at this time.  Although the court does not currently consider their admission justified, the court will determine during trial whether some or all of these pornographic materials may be admitted depending on the other evidence and arguments advanced by the parties.

## CONCLUSION

For the foregoing reasons, Schaffer's motion to suppress the pretrial photo arrays and his statements during the interview at his office are denied.  The government's motion to admit the four videos of Schaffer with two other minors is granted.  Their admission at trial will be limited to only those portions of the videos that the government has already designated, and limiting instructions shall be provided to the jury.  The court declines to rule on the admission of the ten videos and three still images of child pornography prior to trial and reserves decision pending the presentation of evidence at trial.

SO ORDERED.

__/s/_____
Allyne R. Ross
United States District Judge

Dated:          April 18, 2014
                Brooklyn, New York